# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| STEPHANIE DORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 16-CV-508-SMY-DGW |
| | ) | |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Before the Court are Defendant Unum Life Insurance Company of America's ("Unum") Motion for Judgment on the Administrative Record (Doc. 52) and Plaintiff Stephanie Dorris' Motion for Summary Judgment (Doc. 58). These are cross-motions for judgment on the administrative record under Federal Rule of Civil Procedure 52(a), and the Court finds that resolution of the case on the administrative record is appropriate. *Marantz v. Permanente Med. Grp., Inc. Long Term Disability Plan*, 687 F.3d 320, 327 (7th Cir. 2012).[1]

At issue is Unum's termination of long-term disability benefits ("LTD") which it had paid to Dorris from 2003 until September 2015. The Court now makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

Plaintiff Stephanie Dorris was President and owner of Beans Plus, Inc., and its sister business, The Stock Minders, Inc., from 1997 until 2001. (Administrative Record ("AR") at pp.

---

[1] Plaintiff's filing is captioned "Motion for Summary Judgment." However, the motion asks for judgment in her favor under Rule 52(a) on the Court's *de novo* review of the Administrative Record, and only references summary judgment under Rule 56 as an alternative. (Doc. 58 at 7).

494-498)² The employees of Beans Plus were covered by a LTD policy ("the Policy") issued by Unum. (AR 127-147). Under the Policy provisions, an insured is "disabled" or has a "disability" if, because of "injury or sickness":

1. you cannot perform each of the material duties of your regular occupation; and

2. after benefits have been paid for 24 months, you cannot perform each of the material duties of any gainful occupation for which you are reasonably fitted by training, education or experience; or

3. you, while unable to perform all of the material duties of you regular occupation on a full-time basis, are:

   a. Performing at least one of the material duties of your regular occupation or another occupation on a part-time or full-time basis; and

   b. Currently earning at least 20% less per month than your indexed pre-disability earnings due to that same injury or sickness. (AR 128).

Dorris filed for LTD benefits in December 2001. (AR 149-150). Her initial basis for filing was severe pelvic and abdominal pain caused by endometriosis. (AR 149-156). The claim was approved in early 2002 and Unum began paying her benefits. (AR 263).

Dorris had undergone a number of surgical procedures for pelvic and abdominal pain prior to her filing for LTD benefits, including eight laparoscopic procedures and a complete hysterectomy. (AR 539). She underwent additional procedures after her claim was accepted. Specifically, in July 2003, she had surgery to remove adhesions in her abdomen and pelvis involving her ascending colon, abdominal sidewall, cecum, bowel and pelvic sidewall, as well as rectocele repair. (AR 929-936). A similar procedure was performed in September 2004 which eliminated more adhesions and included a partial resection of her bowel. (AR 1155-61). She was also treated using a number of nerve block injections in an effort to stem the pain in December 2002 to April 2003. (AR 701-702, 875-881).

---

² The Administrative Record in this case is in excess of 5500 pages and was filed as 18 Exhibits and Attachments to Exhibits, from Doc. 31-1 through 39-1, due to the file size restrictions imposed by the Court's CM/ECF system.

In late 2004, Dr. Andrew Cook had Dorris screened for Lyme disease, a tick-borne bacterial infection. On a questionnaire, Dorris was "positive for 26 out of 38 questions" and reported significant exposure to ticks in the past. (AR 1258). A follow-up blood test was consistent with Lyme disease. (AR 1274-76). When asked about Dorris' restrictions and limitations on a subsequent Attending Physician's Statement form, Dr. Cook stated that Dorris suffered from a loss of concentration and that her fatigue "can be severe." (AR 1223)

In April 2005, Dorris applied for disability benefits from the Social Security Administration. (AR 1887-95). After an initial denial, she was awarded full disability benefits by the Administrative Law Judge ("ALJ"). (AR 1890). The ALJ determined that Dorris was impaired by Lyme disease, chronic pain syndrome, endometriosis, cervical spine stenosis and depression, and that she had moderate difficulties in maintaining concentration, persistence or pace. (AR 1892). He also made a finding on her residual functional capacity ("RFC") for work that included the following limitations: sitting for two hours and two hours standing or walking per eight-hour workday; allowance for more than three unscheduled absences per month; and limitation to simple, routine, repetitive work. (AR 1893). Dorris continues to receive Social Security Disability benefits.

In June of 2007, Unum received an Attending Physician's Statement from Dr. Rashmi Nakra, a Psychiatrist. (AR 1868-69). Dr. Nakra diagnosed Lyme disease and Major Depression, noting "serious cognitive deficits" and an inability "to sustain attention and focus." (Id.).

Dr. Charles Crist, one of Dorris' treating physicians, also wrote a letter in June 2007 describing her condition and treatment. (AR 1871). Crist, who according to Dorris is a "Lyme Disease Specialist," stated that Dorris had been diagnosed with borreliosis (Lyme) and exhibited "cognitive issues, trouble reading and comprehending, trouble with numbers, numbness, eye problems, long-lasting migraines and urinary difficulties," as well as significant body pain. (Id.).

Beginning in 2008, Dorris began seeing Dr. Steven Harris for treatment of Lyme disease. (AR 5430). Dr. Harris' records, especially from 2012 onward, paint an overall picture of general improvement, but with significant plateaus and backsliding. On May 2, 2012, Dr. Harris saw Dorris for an office visit at which she reported that she "has made a remarkable recovery in the last few months, minimal to no pelvic pain." (AR 3885). She also reported that she continued to have fatigue and stamina issues but felt that "her brain [was] back." (Id.). This improvement with continued fatigue issues appears to have persisted over the next several months, to the point that Dorris was playing nine holes of golf once a week, taking daily walks and doing "things that were impossible for 10 years." (AR 3877-84). However, the positive trajectory soon began to reverse itself.

In October 2012, Unum engaged Norma Parras Potenzo, a Vocational Rehabilitation Consultant ("VRC"), for clarification of the demands of Dorris's regular occupation. (AR 3796-800). Ms. Parras Potenzo described the "Material and Substantial Duties" of a "Company President" as follows:

> Responsible for the profitability of the entire organization; Holds position of the top executive and principal organization leader in the organization; This position is distinguished from others in that it is the top ranking executive and, in most cases, is the highest paid executive in the organization; Confers with organization officials to plan business objectives, to develop organizational policies to coordinate functions and operations between divisions and departments, and to establish responsibilities and procedures for attaining objectives; Reviews activity reports and financial statements to determine progress and status in attaining objectives and revises objectives and plans in accordance with current conditions; Directs and coordinates formulation of financial programs to provide funding for new or continuing operations to maximize returns on investments, and to increase productivity; Plans and develops industrial, labor and public relations policies designed to improve company's image and relations with customers, employees, stockholders and public; Evaluates performance of executives for compliance with established policies and objectives of firm and contributions in attaining objectives. May preside over Board of Directors; May serve as chairman of committees, such as management, executive, engineering and sales. (AR 3797-98).

Parras Potenzo classified the physical demand level of the occupation as sedentary. (AR 1799). She noted that the mental/cognitive demands of the occupation include the following on a frequent (2.5 to 5.5 hours in an 8 hour workday) basis: use of detailed memory instruction, concentration and attention, coping with a work schedule, coping with work distractions, making work decisions, adaptation to change, travel and independent planning. (Id.). She also described specific job duties and responsibilities associated with the occupation, including "accepting responsibility for formulating plans, designs, practices, policies, methods, regulations and procedures for operations or projects;" "supervising subordinate workers to implement plans and control activities[;]" "solving problems, making evaluations, or reaching conclusions based on subjective or objective criteria, such as the five senses, knowledge, past experiences, or quantifiable or factual data;" and "frequent changes of tasks involving different aptitudes, technologies, techniques, procedures, working conditions, physical demands or degrees of attentiveness without loss of efficiency or composures." (Id.).[3]

In November 2012, Dorris complained of increased issues with fatigue and "increased brain fog." (AR 3875). On January 10, 2013, she reported that she "was doing fairly well, was golfing for a while, but developed worsening pelvic, muscle, and joint pain. She has had some significant episodes of breakthrough pain, some dizziness, some lightheadedness, and some weakness. Cognitively, she does remain better." (AR 4248) She also reported "much worsening fatigue, and intensive napping[,]" and gave the appearance of being more fatigued than she previously had. (Id.). The following month, she complained of chronic "mild stabbing" pain in her upper abdomen and "some weakness." (AR 4247).

---

[3] This overall description and characterization was "recertified" by Robert Manganello, a Senior Vocational Rehabilitation Consultant for Unum, in September 2015. (AR 5293-97).

On March 18, 2013, Unum sent a letter to Dorris informing her that it had completed its review of her recent medical history and that she continued to be eligible for LTD benefits. (AR 4048). This decision appears to be based on a review of Dorris' file conducted by Sharon Davenport, RN, Unum's Clinical Nurse Consultant. (AR 4042-45). In her report, Davenport summarizes Dorris' medical history, with particular emphasis on recent records and statements up to December 2012. She noted the fluctuations in Dorris' condition and symptoms as reflected in Dr. Harris's office notes, including her "remarkable recovery" and subsequent backslide from March to December 2012. (AR 4044). Davenport described Dorris' progress at that time:

> The Insured is slowly improving in her functional abilities. She is expanding her activities. She is still experiencing inconsistent tolerances/reactions to her activities. Her chronic abdominal pain is improving and she is requiring less pain medications. Her fatigue level and "brain fog" continues to fluctuate. Her ability for performing functional activities on a consistent and reliable basis has not yet been attained. (AR 4045).

With respect to Dorris' functional capacity, Davenport concluded that she could frequently sit, occasionally stand or walk, and occasionally lift up to ten pounds. (Id.). She also concluded that "[d]ue to [Dorris'] complaints of fatigue and pain limiting her activities, it is not anticipated that she could perform these or travel on a consistent and reliable basis." (Id.). The report also notes evaluations by both Dr. Rybicki (Dorris' primary care physician) and Dr. Harris indicating that Dorris was not able to perform sedentary-level work. (Id.).

Dorris saw Dr. Harris in May 2013 and complained of worsening muscle and joint pain, worsening heart palpitations, more frequent headaches and migraines, and diarrhea. Her fatigue and stamina were improved, although she stated that she "still has to regulate her energy[.]" (AR 4245).

In June 2013, Dorris reported mild improvement. (AR 4244). She stated that she was volunteering at the St. Louis Zoo, and that she had been "quite active" at a three-day art event. (Id.). This progress, however, was tempered by a "collapse" for several days afterward, with full

recovery after approximately two weeks. (Id.). In July 2013, her migraines and diarrhea improved, but she continued to have trouble sleeping. (AR 4242).

In August 2013, Dorris reported that she had intermittent headaches and fatigue, as well as "some brain fog and memory lapses," but not as severe as they had been previously. (AR 4240) Her short term memory worsened by her September 2013 telephone consultation with Dr. Harris, and she had increasingly frequent migraines. (AR 4238). The migraine issues largely resolved by her October 2013 consult, and her fatigue and lethargy had improved to the point where she only needed a 45 minute nap each day instead of the "3 hours and multiple" naps previously required. (AR 4235). This improvement continued in November 2013, when she reported that she was "doing well," "had good energy," "did well" on a trip to Hawaii and was able to chase her dog "for several miles." (AR 4233).

During her January 2014 telephone consult with Dr. Harris, Dorris stated that she was "[o]verall doing fair." (AR 4232). She complained of "significant" headaches, although they had lessened over the prior week, and reported no digestive complaints. (Id.). Dorris again had a telephone consultation with Dr. Harris on March 13, 2014. (AR 4267). She reported daily migraines (with some relief from medication) and increased "brain fog." (*Id.*).

On April 8, 2014, Dorris saw Dr. Harris for an office visit. (AR 4265). She reported waking at 3:30 a.m., headaches upon waking, headaches with activity, and exhaustion. (Id.). She also stated that she was "more foggy than 6 mos. ago[,]" was "not picking up on mental mistakes," and was having "more memory issues and spaciness," with "word finding issues." (*Id.*). She was still "doing some volunteer work." (Id.).

Dorris stated that she was "a little bit better" during her next phone consultation with Dr. Harris's office. (AR 4264). Her migraines were also "a little bit better" but she complained of no increase in energy and some bladder issues. (Id.). On July 7, 2014, Dorris reported that her

headaches and bladder issues had improved, in spite of an incident of severe allergic reaction. She also stated that she had "a little bit more energy." (Id.).

At her September 2014 check-in, Dorris reported that she had been having neurological symptoms, including two episodes of smell hallucination and issues with numbness in her left leg and foot drop after a dental procedure. (AR 4262). She was seen in the emergency room for the latter incident, where she was diagnosed with a pinched nerve. (Id.). The foot drop and olfactory hallucinations had "mostly resolved" by her October 2014 consultation, and in November 2014, she described herself as "doing quite well" despite her home being destroyed by a tornado. (AR 4259).

On January 6, 2015, Dorris had another telephone conversation with a Physician's Assistant at Dr. Harris's office. (AR 4258). Upon moving back into her house, Dorris was sick for several days with vomiting, diarrhea, headache and intense pain in her breasts, which she attributed to having "just overdone it." (Id.). She again reported nausea, vomiting and headaches on February 24, 2015, and reporting having an incident of rapid heartbeat, dizziness and high blood pressure while driving. (AR 4257).

On February 25, 2015, Dorris saw Dr. Rybicki. (AR 4367). According to the office notes, her primary complaint was "[o]ne week of fatigue and palpitations. She also described the driving incident. (Id.). Dr. Rybicki's review of systems reflects a general denial of complaints regarding headaches, pain, nausea, vomiting, sleep disturbances and (curiously, given that it is listed as her primary complaint elsewhere) fatigue. (AR 4368). Dr. Rybicki also lists only Sumatriptan (Imitrex) under "Medications." (Id.).

In March 2015, Unum requested that Dorris submit a Disability Status Update form and medical records releases, which she provided. (AR 4061-74). In the status update, Dorris described her day-to-day activities as "light household chores, e-mail mgt. [*sic*], local volunteer activities, gardening, walking and other light exercise, watching TV/movies." (AR 4065).

Unum's records reflect a follow-up telephone conversation with Dorris on April 3, 2015, in which she stated that she was "going in a good direction" and had more energy. (AR 4081). She reported that she was sleeping less than her previous 20 hours a day. (Id.). She also reported that her neurological and cognitive issues had improved from the time when she could "barely read a paragraph, couldn't watch tv or read" due to lack of concentration or comprehension. (Id.). She stated that she was now able to read a book or watch a movie "without losing track of it or having to stop at multiple times." (Id.).

Dorris also described her activities and activity level during the April 2015 telephone call. She mentioned her volunteer work at the zoo, which involved a three-hour shift each Friday afternoon. (AR 4082). She noted that committing to a set schedule for this was "a big thing for her." (Id.). She also discussed her volunteer work with Art on the Square arts festival, which had no set schedule and was "nothing she has to go to on a regular basis." (Id.).[4] Dorris stated that she could "easily" play nine holes of golf, but that she would "fall apart" if she attempted to play 18 holes. (Id.). Overall, she described herself as being able to do "about half of what she could[,]" noted a pattern of setbacks to recovery, and described her progress as "small baby steps[.]. (AR 4081-82).

In addition to above-mentioned volunteer activities, Unum's investigators determined that Dorris was involved in a community group attempting to prevent the relocation of St. Elizabeth's Hospital. The group called Oppose the Move, was an effort to prevent the hospital from leaving Belleville, Illinois for an announced new location in O'Fallon, Illinois. Dorris' role in Oppose the Move is unclear, but she gave at least one public address and a statement to the media on behalf of

---

[4] During her initial appeal of the termination of benefits, Dorris submitted a letter from the Chairman of Art on the Square, who had previously been treasurer and had recruited Dorris to fill that role. (Doc. 5388-89). He described his duties in that role as invoicing sponsors, depositing checks, paying bills, reconciling bank accounts, attending committee meetings and participating in special events. (Id.).

the group.  (Jamie Forsythe, <u>Hospital Wars: St. Elizabeth's, Memorial Fighting Over Whether Another Hospital Needs to Happen</u>, Belleville News-Democrat, April 18, 2015; BNDVideo, *Stephanie Dorris*, YOUTUBE (April 17, 2015), https://youtu.be/Ns-k6NNbkto; BNDVideo, *Oppose St. E's Hospital Move Rally,* YouTube (September 23, 2014), https://youtu.be/DUMgajLXtuo).  Efforts to block the move were unsuccessful.  During Dorris's initial appeal of her benefits termination, she submitted a letter from Patty Gregory, the organizer of Oppose the Move.  (AR 3586).  Ms. Gregory stated that the public address involved Dorris reading prepared remarks on her behalf, as she had lost her voice.  (*Id.*).  She described Dorris as "more of our research point person for the project" and provided little detail as to what duties that entailed.  (*Id.*).

Dorris's headaches and nausea improved somewhat by her April 2015 telephone call with Ms. Sorenson at Dr. Harris' office, and she was able to travel to Colorado (albeit with symptoms of altitude sickness which largely overlapped her chronic issues).  (AR 4491).  Her nausea and vomiting got worse by a May 2015 telephone appointment, although she had managed to play a round of golf.  Her heart rate/blood pressure issues had "calmed down."  (AR 4490).

Dr. Harris saw Dorris for an office visit on May 27, 2015, where she reported continued headaches and vomiting and recurrence of the high heart rate and blood pressure issues.  (AR 4489).  She reported volunteering at the zoo once a week and some involvement in "civic affairs," as well as being able to golf for nine holes.  (Id.). However, she complained of digestive and stamina issues, the latter of which prevented her from golfing for 18 holes and required increased napping.  (Id.).

On June 17, 2015, Dr. Harris responded to a letter from Unum requesting his opinion on Dorris's functionality and details of her treatment.  (AR 4409-10).  Based on the provided Dictionary of Occupational Titles ("DOT") definitions of "sedentary" and "light" work functions, Dr. Harris opined that Dorris was "capable of doing sedentary work only" and only on a part-time basis, limited to four hours per day.  (AR 4410).  He also stated that she may need frequent breaks

and "may be frequently absent" due to "flare-ups." (Id.). Dr. Harris concluded that Dorris was unable to work on a full-time basis due to fatigue, migraines, nausea and vomiting. (Id.).

In July 2015, Dorris reported migraine headaches about once a week and increased fatigue, as well as "breakthrough pain" on her right side. (AR 4488). On July 20, 2015, Debra Maeder, RN, a Clinical Nurse Consultant for Unum, filed a report similar to the report that Sharon Davenport completed in 2013. (AR 4441-45). She summarized the medical records she had reviewed and noted that "the insured has demonstrated improvement and steady increase in functionality related to Lyme disease and pelvic pain. She is no longer on ketamine or methadone for pain. Records indicate headaches are better." (AR 4444). Maeder concluded that Dorris' "activities appear in excess of this functionality [sedentary work] and in excess of the part time sedentary functionality as opined by Dr. Harris." (AR 4445). Dr. Dianna Neal, another Unum consultant, also reviewed Dorris' file and sent a letter to Dr. Harris asking for clarification, because based on the clinical information available and Dorris' activity level, Dr. Neal "d[id] not see that she would be precluded from full-time work within the physical demands outlined." (AR 4455-56).

Dorris was seen by her Gynecologist, Dr. Andrea Stephens, on July 23, 2015 for her annual well-woman examination. (AR 4515). The exam notes include reports of headaches, heart palpitations, nausea and fatigue, although the "Problems with Memory" and "Problems Sleeping" questions are answered "no" and she presented as "alert and oriented." (AR 4516-17). Under "Exercise is 7500 steps/d in [S]ummer, golf in leagues 1-2x/w and walking as docent at zoo." (AR 4516). Her medication list includes a number of antibiotics, Malarone (an anti-parasite/antifungal medication), thyroid medication, Imitrex for migraines and Vicodin. (AR 4515).

Unum engaged Dr. Trent Thomas and Dr. James Bress to review Dorris' medical records. On September 11, 2015, Dr. Thomas issued a report on his conclusions, stating that despite her reports of symptoms, Dorris was capable of performing full-time sedentary work as defined in

Unum's October 2012 VRC. (AR 5278-87). Dr. Bress, reviewed "the medical record" including the reports of Maeder and Dr. Thomas, as well as Dr. Harris' Attending Physician Statement. He issued an opinion concurring with Dr. Thomas on September 16, 2015. (AR 5288-92).

On September 19, 2015, Dorris had another phone consultation with Dr. Harris's office staff. (AR 5370). She described increased cognitive issues over the preceding two weeks, specifically noting issues with finding words. (Id.). Dorris also stated that her pain and fatigue had become "a little more random" and that she had to nap more. (Id.).[5] On September 23, 2015, Unum called and sent a letter to Dorris informing her that her benefits would be terminated immediately, with the final payment to be made that day. (AR 5313-17).

When Dr. Harris saw Dorris again for an office visit in November 2015, her condition had deteriorated. (AR 5372). She reported increased cognitive issues, including transposing numbers, trouble planning and organizing, memory loss, "some major focusing problems" and continuing brain fog. (Id.). Her headaches had become a near-daily occurrence, she was having severe back pain, and she was having increased issues with high blood pressure and heart palpitations. (Id.).

Dorris initiated an appeal of the decision to terminate her LTD benefits through Unum's internal process on December 18, 2015. (AR 5348-64). As part of the appeal, Unum engaged Dr. Scott Norris to review the medical records and the conclusions of Ms. Maeder, Dr. Thomas and Dr. Bress. He provided an initial report on February 1, 2016, concurring with the previous conclusions generated by Unum. (AR 5453-57).

A Vocational Rehabilitation Consultant, Richard Byard, subsequently advised Unum that, based on jobs falling within the DOT listing assigned to Dorris's last occupation, it would "be reasonable to conclude that the insured's occupation is one that would commonly require work

---

[5] In October 2015, she described increasingly frequent pain issues, including an episode of breakthrough pain on her right side, as well as issues with heart palpitations. (AR 5371).

hours in excess of a standard 40 hour work week." (AR 5495). Byard also suggested that such occupations "typically require an occasional level of broader regional and/or national air travel." (*Id.*). Dr. Norris was then asked, in light of these two additional factors, whether Dorris still had the functional capacity to perform at the functional level demanded by her occupation as described in the October 2012 VRC Statement. (AR 5496). He concluded that she was functional at that level, even with these additional demands. (AR 5496-99).

Dorris submitted two statements from Dr. Harris during the appeals process. One of the statements, drafted by Dorris' counsel, sets forth a number of Unum's conclusions from its denial and asks if Dr. Harris agreed with those assessments. (AR 5377-79). Dr. Harris also submitted a letter summarizing his diagnoses of Dorris and her symptoms, including extreme fatigue, cognitive issues (including memory loss, word finding issues and "major focusing problems") and pain. He also stated that she suffers from depression, anxiety, heart palpitations, and elevated blood pressure. (AR 5383).

Unum also consulted a Psychiatrist, Dr. Peter Brown, with regard to whether Dorris' records supported either behavioral health restrictions and limitations or cognitive deficits. (AR 5514). On March 17, 2016, Dr. Brown responded, "Uncertain. More information required." (Id.). He recommended an independent neuropsychological evaluation to resolve these questions. (Id.). On April 6, 2016, Unum sent a letter requesting such an examination, which Dorris' counsel refused due to the approaching regulatory deadline for resolving the appeal. (AR 5521-33). Unum issued its final decision on Dorris' appeal on April 15, 2016. (AR 5545-55).

## **LEGAL STANDARD**

The parties agree that the Policy does not grant Unum discretion in awarding or denying coverage, and therefore the appropriate standard of review of the termination decision is *de novo*. On de novo review, "district courts… [make] an independent decision about the employee's

entitlement to benefits." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). "What happened before the Plan administrator or ERISA fiduciary is irrelevant." *Id.*[6] Therefore, the issue is not whether Unum gave Dorris a full and fair hearing or undertook a selective review of the evidence; rather, the ultimate question is whether she is entitled to the benefits she seeks under the Policy. *Id.*; see also *Moore v. INA Life Ins. Co. of New York*, 66 F.Supp.2d 378, 385 (E.D.N.Y. 1999) (de novo review means that a court essentially "stands in the shoes" of the ERISA fiduciary/administrator).

In deciding whether Dorris is entitled to LTD benefits under the Policy, the Court has the discretion to "limit the evidence to the record before the plan administrator, or ... [to] permit the introduction of additional evidence necessary to enable it to make an informed and independent judgment." *Patton v. MFS/Sun Life Fin. Distribs., Inc.,* 480 F.3d 478, 490 (7th Cir. 2007) (quoting *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994)). Here, the Court finds the 5500-plus page Administrative Record to be an adequate basis for its decision in this case, and that the additional exhibits offered by the parties do not shed any significant light on the dispositive issues.

In construing the terms of the Policy, federal common law rules of contract interpretation apply. *Diaz*, 499 F.3d at 643 (citing *Life Ins. Co. of North America v. Von Valtier,* 116 F.3d 279, 283 (7th Cir. 1997)). In other words, "the standard is an objective one and the scope of judicial review is the same as it is with respect to any other alleged breach of contract." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000). As the party seeking to enforce benefits

---

[6] Dorris' motion outlines the alleged violations of ERISA regulations regarding time for response to her appeal and asks for reinstatement of benefits "due to Unum's procedural violations of ERISA." (Doc. 58 at 20-21, 24). The Seventh Circuit precedent on de novo review of ERISA determinations precludes consideration of these factors, which would logically also preclude granting relief on those grounds. See *Walsh v. Long Term Disability Coverage for All Employees Located in the United States of DeVry, Inc*., 601 F. Supp. 2d 1035, 1043 (N.D. Ill. 2009). The cases cited by Plaintiff where reinstatement was granted for procedural violations involved plans where the administrator had discretion, and are therefore inapplicable.

under the Plan, Dorris bears the burden of proving that she is entitled to benefits by a preponderance of the evidence. *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005).

## **CONCLUSIONS OF LAW**

In determining whether Dorris has provided sufficient proof that she met one of the Policy definitions of "disability" at the time Unum terminated her LTD benefits, the Court has assessed both the credibility and weight to be given to the various sources of information and opinion. Dorris's claimed symptoms are largely based on self-report, but the Court finds her statements to both medical providers and Unum's investigators to be generally credible. Specifically, the record reflects that Dorris underwent significant treatment over a long period of time in efforts to alleviate her symptoms. She reported both improvement and worsening of symptoms to her medical providers as they occurred and was open about any progress she had made when discussing her status with Unum. Although most of Dorris' symptoms are largely subjective, her descriptions of them and their severity cannot be disregarded, especially in light of evidence suggesting reliability, such as a long history of unpleasant treatment for such complaints. See *Diaz,* 499 F.3d at 646 (citing *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)).

The Court must also decide the weight to be given the various medical professionals' opinions expressed in this case. Dorris relies primarily on the opinions of Dr. Harris to support her claim that she is unable to perform work on a full-time basis. At the same time, Unum attacks Dr. Harris' reliance on Dorris' self-reported symptoms and his failure to perform any functional testing of her limitations.

Unlike in the Social Security disability context, there is no special deference to a treating physician's opinions under ERISA. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003). That said, the Court finds it significant that Dr. Harris had the opportunity to evaluate Dorris' condition in person and via telephone on an ongoing basis, to judge the credibility of her

complaints for treatment purposes, and to make a personal judgment on how her symptoms affected her ability to function. Conversely, Unum's reviewing physicians and medical professionals relied solely on their reviews of the medical records. As such, the Court accords more weight to Dr. Harris' opinions than those of Unum's reviewing medical professionals.

The Policy sets forth two options under which an insured person who has been injured or ill for more than 24 months can continue to qualify as disabled; both of which require that the insured be unable to perform each material duty of their "regular occupation" due to sickness or injury. The first option requires an additional showing that the insured is unable to perform each of the material duties of *any* gainful occupation for which they are reasonably fitted by training, education or experience (the "Any Gainful Occupation Option"). In order to trigger the second option, the insured must establish that they are performing at least one of the material duties of their regular occupation or another occupation on a part or full time basis, but earning at least 20 percent less than their indexed pre-disability earnings (the "20 Percent Less Option").[7]

The first task, then, is to determine the material duties of Dorris' regular occupation (president of a corporation) and to decide whether the weight of the evidence suggests she could perform each of them. Neither party challenges the October 2012 description of the position provided by Unum's VRC (as amended by Mr. Byard in 2015 regarding work week and travel) and so the Court will utilize that description as detailed in the Findings of Fact.

Based on the weight of the evidence, the Court finds that Dorris was unable to perform the material duties of Company President due to her ongoing medical conditions at the time benefits were terminated. As noted by Unum's own vocational specialists, the material duties include frequent use of high-level mental functions, including detailed memory, formulating plans, policies and procedures, concentration and performing frequent changes in tasks. This includes the ability

---

[7] "Indexed pre-disability earnings" is essentially the insured's last rate of earnings adjusted for inflation. (AR 134)

to perform these functions "frequently" on a full-time basis which Mr. Byard noted could reasonably be expected to exceed 40 hours a week.

As evidenced by the treatment records, Dr. Harris' opinions as reflected in the statements provided to Unum, and Dorris' self-reports, Dorris suffers from significant fatigue and cognitive impairments which would prevent her from meeting the demands of her regular occupation. That occupation also requires the ability to meet these demands consistently for a significant portion of a 40 hour or longer work week. The evidence submitted shows that even in her improved state, Dorris was not able to reliably perform the material duties of her regular occupation at the time her LTD benefits were terminated. Thus, she meets the initial requirement for continuing disability. But that does not end the Court's analysis.

Dorris has failed to prove that she satisfied either additional requirement for LTD coverage under the Policy at the time Unum terminated her benefits. As previously noted, the "Any Gainful Occupation Option" requires her to show that she cannot perform the material duties of any gainful occupation for which she is reasonably fitted by training, education or experience. The Policy does not specify what qualifies as a gainful occupation for which she is reasonably fitted. Dorris contends that the positions for which she is reasonably fitted are those she has previously occupied: Staff Accountant, Senior Litigation Consultant, Chief Financial Officer, Corporate Controller and Vice President of Finance, and that she cannot perform those jobs. However, the record does not support her contention.

Dorris has failed to submit any evidence of the material duties of these positions. She asserts in her brief in support of her motion that both her regular occupation and these past positions require working "55-70 hours a week, 5-7 days a week, 48-50 weeks per year[]" (Doc. 58 at 22), but provides no source or citation for this assertion. She notes several times that Unum never conducted a vocational analysis regarding any other gainful occupations. But it is not Unum's

burden to establish that Dorris is <u>not</u> disabled under the terms of the Policy – the burden of proof rests with Dorris to establish that she <u>does</u> meet the requirements for continued eligibility. While she could have possibly met her burden with a vocational analysis or other information showing that the physical and other demands of relevant gainful occupations are prohibitive for her, she produced no such evidence in either her appeal process or here. Her conclusory assertions will not suffice and the Court cannot conclude that she is unable to perform the material duties of these positions or any gainful occupations based on the record before it.

In the alternative, Dorris asserts that she qualifies for coverage under the Policy's "20 Percent Less Option" based on her volunteer work. (Doc. 58 at 21). Once again, this is as far as Dorris goes – there is no evidence or explanation as to what material duty she is fulfilling through volunteer work. Moreover, none of the material duties identified for her regular occupation appear on their face to apply to her work at the St. Louis Zoo, her work with Oppose the Move or with Art on the Square, and no material duties of any other occupation are identified. Again, without some competent evidence that she was performing one material duty of her regular occupation, Dorris has failed to meet her burden to establish that she meets the "20 Percent Less Option."

For the foregoing reasons, the Court concludes that Dorris was not entitled to the continuation of long-term disability benefits under her policy with Unum Life Insurance Company.

## **ATTORNEY'S FEES**

Defendant has requested reasonable costs and attorney's fees pursuant to 29 U.S.C. §1132(g). There is a "modest presumption" in favor of awarding fees to the prevailing party in an ERISA case such as this, but the presumption may be rebutted. *Senese v. Chicago Area I.B. of T. Pension Fund*, 237 F.3d 819, 826 (7th Cir. 2001) (citing *Harris Trust & Sav. Bank v. Provident Life & Accident Ins. Co*., 57 F.3d 608, 617 (7th Cir. 1995). An award of attorney's fees to a successful defendant may be denied "if the Plaintiff's position was both 'substantially justified' – meaning

something more than non-frivolous, but something less than meritorious – and taken in good faith, or if special circumstances make an award unjust." *Id.* (citation omitted). Here, Plaintiff's position was substantially justified and taken in good faith. Therefore, the Court declines to award Defendant attorney's fees. However, Defendant may submit its reasonable costs by petition.

## CONCLUSION

Defendant's Motion for Judgment on the Administrative Record (Doc. 52) is **GRANTED** and Plaintiff's Motion for Summary Judgment (Doc. 58) is **DENIED.** All other pending motions are **DENIED** as **MOOT**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant and against Plaintiff and to close the case

**IT IS SO ORDERED.**

**DATED:  April 27, 2018**

**s/ Staci M. Yandle**
**STACI M. YANDLE**
**United States District Judge**
